**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

MARK DANIEL GROSS,

      Plaintiff,

v.                                                                    Case No.  8:05-CV-1767-27TBM

BOB WHITE, SHERIFF, PASCO COUNTY, et al.,

      Defendants.

_____/

## ORDER

Before the Court is Defendant, Tracy C. McKay, D.O.'s Second Amended Motion to Dismiss the Second Amended Complaint and Memorandum of Law in Support Thereof (Dkt. 68), and Plaintiff's Reply to Second Amended Motion to Dismiss (Dkt. 69), and Memorandum of Law to the Second Amended Civil Rights Complaint (Dkt. 70).

### Procedural History

Plaintiff, a prisoner proceeding *pro se*, initiated this cause of action by filing a civil rights complaint pursuant to 42 U.S.C. § 1983 (Dkt. 1). The events about which Plaintiff complained occurred while he was incarcerated in the Pasco County Jail (hereafter "PCJ").  Plaintiff subsequently filed an amended complaint in which he named the State of Florida, Bob White, Sheriff of Pasco County, Tracy C. McKay, D.O., and twenty-five unnamed deputy sheriffs as Defendants (Dkt. 21). On September 28, 2007, the Court dismissed Plaintiff's claims against the State of Florida and Bob White for failure to state a claim for which relief may be granted (Dkt.  35).

On November 14, 2007, a motion to dismiss was filed by Defendant McKay and the twenty-five unidentified deputy sheriffs (Dkt. 42). On January 22, 2008, Plaintiff filed his response to the

motion to dismiss (Dkt. 49).  On May 9, 2008, the Court granted in part and denied in part the motion to dismiss (Dkt. 55).  The Court dismissed the unidentified deputy sheriffs, granted Plaintiff leave to file a second amended complaint, and denied his motion to reinstate the State of Florida and Bob White as defendants in this action (Id.).

## Second Amended Complaint

On June 2, 2008, Plaintiff filed his Second Amended Complaint (Dkt. 56) in which he identifies six defendants: 1) Bob White, Sheriff of Pasco County; 2) the State of Florida; 3) Dr. Tracy McKay; 4) Nurse Carr, Medical Department Supervisor at PCJ; 5) Lt. Hoolan, Grievance Supervisor at PCJ; and 6) Captain Head, Administrator Supervisor at PCJ (Id. at pp. 6-8).

## Standard of Review

Because Plaintiff is seeking redress from governmental officers, the Court has undertaken the mandatory screening of his complaint pursuant to 28 U.S.C. § 1915A.  In pertinent part, § 1915A provides:

>     (a)     Screening.--The court shall review, before docketing, if feasible or, in any event, as soon as practicable after docketing, a complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity.
>
>     (b)     Grounds for dismissal.--On review, the court shall identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint --
>
>         (1)     is frivolous, malicious, or fails to state a claim upon which relief may be granted; or
>
>         (2)     seeks monetary relief from a defendant who is immune from such relief.

28 U.S.C. § 1915A.  The language of the statute does not distinguish between prisoners who proceed

2

*in forma pauperis* and those who pay the requisite filing fee. The procedure required by § 1915A is, by its terms, a screening process to be applied *sua sponte. See id.*

In determining whether to grant a Fed. R. Civ. P. 12(b)(6) motion, the Court construes the complaint in the light most favorable to the plaintiff and its allegations are taken as true. *See Roberts v. Florida Power & Light Co.*, 146 F.3d 1305, 1307 (11th Cir. 1998), *cert. denied*, 525 U.S. 1139 (1999). While courts must liberally construe and accept as true allegations of fact in the complaint and inferences reasonably deductive therefrom, they need not accept factual claims that are internally inconsistent; facts which run counter to facts of which the court can take judicial notice; conclusory allegations; unwarranted deductions; or mere legal conclusions asserted by a party. *Ellen S. v. The Fla. Bd. of Bar Exam'rs*, 859 F.Supp. 1489, 1492 (S.D. Fla. 1994). *See also Marsh V. Butler County, Alabama*, 268 F.3d 1014, 1036 (11th Cir. 2001) (finding that "[i]n the light of the usual pleading requirements of Fed. R. Civ. P. 8(a), unsupported conclusions of law or of mixed fact and law have long been recognized not to prevent a Rule 12(b)(6) dismissal.") (citation omitted); *Mass. School of Law v. American Bar*, 142 F.3d 26, 40 (1st Cir.1998) (finding that a review court need not "swallow plaintiff's invective hook, line and sinker; bald assertions unsupportable conclusions, periphrastic circumlocutions, and the like need not be credited"). In ruling on a motion to dismiss, federal district courts may consider allegations contained in the complaint and any exhibits attached thereto. Fed.R. Civ. P. 12(b)(6).

A motion to dismiss will be denied unless it appears beyond all doubt that Plaintiff can prove no set of facts in support of his claims that would entitle him to relief. *See Roberts v. Florida Power & Light Co.*, 146 F.3d at 1307. It is only when the facts alleged, if proven, will not justify recovery that an order of dismissal under Rule 12(b)(6) is warranted. In the case of a *pro se* action, the Court should construe the complaint more liberally than it would formal pleadings drafted by lawyers. *See*

3

*Tannenbaum v. United States,* 148 F.3d 1262 (11th Cir. 1998).

## Discussion

Plaintiff asserts the following claims in his Second Amended Complaint:

### Statement of Claim

"The Plaintiff, <u>Mark D. Gross</u>, contends his Eighth (8[th]) Amendment Righs [sic] to be free from 'Cruel and Unusual Punishment' and Fourteenth (14th) Amendment Rights to 'Due Process' were violated by the Defendants named in this Second (2nd) Amended Civil Rights Complaint through 'Gross Negligence, Deliberate Indifference, Cruel and Unusual Punishment, Emotional Distress, Serious Bodily Injury, and Professional Malpractice,' to the Plaintiff, while he was under the 'care, custody, and control,' of the above-cited Defendants, who are in contact with 'Pretrial Detainees' including the Plaintiff, in the Pasco County Jail and/or Courthouse of the Sixth (6th) Judicial Circuit Court in and for Pasco County, Florida." (Dkt. 56 at p. 9).

### Statement of Facts

Plaintiff asserts that from May 6, 2004 through December 2005, he was a pretrial detainee detained at PCJ (Dkt. 56 at p. 9). On August 26, 2004, deputy sheriffs working at PCJ failed to properly restrain an inmate named Timothy Burliegh (hereinafter "Burliegh"), and failed to notify transportation deputy sheriffs of Burliegh's "Red Dot status." (Id. at p. 10). Burliegh has a history of violence towards staff and other prisoners, and he has the ability to escape from restraints such as handcuffs, belly chains, and the black box[1] (Id.). The transportation deputy sheriffs failed to adequately check Burliegh's restraints (Id.).

At approximately 7:00 a.m., the transportation deputy sheriffs transferred Plaintiff, Burliegh, and several other pretrial detainees from PCJ to the Sixth Judicial Circuit Court courthouse in Pasco County, Florida (Id. at p. 11). When they arrived at the courthouse, Plaintiff and Burliegh were

---

[1]"The 'black box' is a hard plastic box placed over the lock apparatus that runs between the prisoner's handcuffs." *See Knox v. McGinnis,* 998 F.2d 1405, 1407 (7th Cir. 1993). The 'black box' is used to prevent prisoners from picking the locks on their handcuffs. *Id.*

locked in a holding cell together (Id.).  Plaintiff objected to being placed in the same cell with Burliegh because of Burliegh's reputation for escaping from restraints and his history of assaulting staff and prisoners (Id.).  Plaintiff requested to be moved out of the holding cell, but the deputy sheriffs ignored his request (Id.).  Approximately five to ten minutes later, Burliegh escaped from his restraints (handcuffs, belly chains, and black box) and began to punch Plaintiff who was still restrained in handcuffs, belly chains, black box, and leg shackles (Id.).  Plaintiff states that the deputy sheriffs were in a position to observe Burliegh when he escaped from his restraints (Id.).

At approximately 8:00 a.m., a nurse from PCJ whom had been called to treat Plaintiff for the injuries he sustained when Burliegh attacked him,[2] placed a Band Aid on a severe cut above Plaintiff's right ear, and handed Plaintiff a few paper towels and told him to wipe the blood off while he was in the courtroom (Id. at p. 13).

At approximately 12:00 p.m., Plaintiff was transported back to PCJ (Id.).  He verbally requested medical treatment for his injuries, but medical staff and deputy sheriffs ignored his request (Id.).

On the next day, August 27, 2004, Plaintiff submitted a written request for medical treatment, to which the medical department responded by instructing Plaintiff to "sign up for sick call." (Id.). When Plaintiff went to sick call, he was told "there is nothing we can do for you, you will just have to live with the problems." (Id.).

On August 31, 2004, x-rays were taken, and medical staff informed Plaintiff that "x-rays indicated nothing wrong and no medical treatment would be given." (Id.).

Between August 30, 2004 and October 3, 2005, Plaintiff submitted thirty-eight (38) "Requests for Administration Remedy" forms (hereinafter "grievances") to Captain Head, Dr. Tracy

---

[2]Plaintiff claims his injuries included "cuts, bruises, hearing impedement [sic] in right ear, swelling on right side of face, blured [sic] vision, dizzy spells, numbness in both arms, sever [sic] swelling at the base of his head and above right ear." (Id. at p. 12).

McKay, and Nurse Carr (Id. at pp. 13-14).[3]  The grievances were either ignored or "trashed" by Lt. Hoolan, and Plaintiff received no medical treatment (Id. at p. 14).

Dr. McKay retaliated against Plaintiff for filing the grievances by ordering Plaintiff moved on January 25, 2005, from general population to an isolation cell in the psychiatric ward at PCJ (Id.). While in the isolation cell, Plaintiff was unable to communicate with anybody, and deputy sheriffs shut off his water supply for the first thirty-six (36) hours he was in the cell, and they constantly banged and screamed on his cell door and left the lights on in his cell at all times, and thereby deprived him of sleep and caused him physical and emotional distress (Id. at pp. 14-15).  Plaintiff remained in the isolation cell from January 25, 2005 through January 31, 2005 (Id. at p. 15).

Plaintiff also claims that Dr. McKay "contributed to the cause of" Plaintiff's second heart attack on February 11, 2005, when on February 4th, 8th, and 11th, 2005, Dr. McKay withheld or stopped Plaintiff's heart and blood pressure medications which he had been prescribed following his first heart attack in May 2004 (Id.).

Finally, Plaintiff alleges that on February 11, 2005, between 9:00 p.m. and 10:30 p.m., he advised a deputy sheriff that he was having a heart attack and needed medical treatment, but the deputy sheriff ignored him (Id.).  At 11:00 p.m., Plaintiff was transported to an outside hospital for emergency treatment for a heart attack (Id. at p. 16).  On a later date, Plaintiff had surgery to place an Automatic Implantable Cardioverter Defibrillator inside him (Id.).

Plaintiff seeks both compensatory and punitive damages from Defendants (Id. at p. 17).

**Claims against State of Florida and Defendant White**

As the Court previously stated in its September 28, 2007 Order, the State of Florida has Eleventh Amendment immunity against Plaintiff's federal claims, and the Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims (*See* Dkt. 35).  Likewise, as explained in the Court's September 28, 2007 Order, Plaintiff fails to state a claim against Defendant White, and

---

[3]Plaintiff asserts the grievances were submitted "through" Lt. Hoolan, the Grievance Supervisor at PCJ (Id. at p. 14).

6

declines to exercise supplemental jurisdiction over Plaintiff's state law claims against Defendant White (Id.).

To the extent Plaintiff asserts in his Second Amended Complaint that Defendant White was "grossly negligent and deliberately indifferent, for he failed to properly perform in his duty to adequately and properly train and/or supervise his subordinates, deputies, employees, medical staff, and contractors..." (Dkt. 56 at p. 10), Plaintiff fails to state a claim for which relief may be granted. Plaintiff's conclusory allegation that Defendant White failed to properly train and supervise his staff to protect Plaintiff from their unconstitutional actions is insufficient to set forth a claim under § 1983. Plaintiff does not allege any specific facts at all connecting Defendant White to the deputy sheriffs' alleged failure to protect Plaintiff from Burliegh's assault, or the medical staff's alleged failure to provide Plaintiff with adequate medical care.

**Claims against Captain Head, Nurse Carr, Dr. McKay and Lt. Hoolan**

Construing Plaintiff's Second Amended Complaint liberally, he claims Defendants Head, Carr, McKay and Hoolan were deliberately indifferent to his serious medical needs. In support of his claim, Plaintiff asserts that between August 30, 2004 and October 3, 2005, he submitted thirty-eight (38) grievances to Defendants Head, Carr and McKay requesting medical treatment for the injuries he sustained when Burliegh attacked him on August 26, 2004. However, Plaintiff alleges, he received no medical treatment during that period of time, and the grievances were either "ignored" by the medical department, or Lt. Hoolan, the grievance supervisor, "trashed" them.

In order to prove a claim for deliberate indifference to serious medical needs, a plaintiff must satisfy both an objective and subjective test. *Farrow v. West*, 320 F.3d 1235, 1242 (11th Cir. 2003). First, a plaintiff must demonstrate the existence of an objectively serious medical need. *Id.* Second, a plaintiff must prove that a jail official acted with an attitude of deliberate indifference to that medical need. *Id.* A showing of deliberate indifference has three components: (1) subjective knowledge on the part of the jail official that there is a risk of serious harm; (2) disregard of that risk; and (3) doing so by conduct that is more than mere negligence. *Id.* at 1245. An official can act with

7

deliberate indifference, and not simply negligence, when he fails or refuses to obtain medical treatment for an inmate. *Id.* at 1246. A delay in the provision of medical treatment can also constitute deliberate indifference when, for example, a defendant delays provision of treatment for non-medical reasons. *Id.* When an inmate has received medical care, courts are reluctant to find deliberate indifference. *Waldrop v. Evans*, 871 F.2d 1030, 1035 (11th Cir. 1989).

Assuming, without deciding, that Plaintiff had an objectively serious medical need, Plaintiff fails to allege sufficient facts showing Defendants were deliberately indifferent to his serious medical needs. Plaintiff claims Defendants were deliberately indifferent to his medical needs because they ignored his requests for medical treatment and he received no medical treatment for his injuries. However, the documents Plaintiff submitted to the Court with his original civil rights complaint, and with his Reply to Second Amended Motion to Dismiss and Memorandum of Law to the Second Amended Civil Rights Complaint refute his claim.

In his Second Amended Complaint, Plaintiff admits that within an hour after Burliegh assaulted him, a nurse came to the holding cell he was in and treated him (Dkt. 56 at p. 13). In his grievance dated August 30, 2004, Plaintiff admits that x-rays were taken on that date, and the response to that grievance states that Plaintiff had "x-rays on 8-30-04 - no evidence of an acute fracture. You were seen by the nurse on 9-2-04 and the facility physian [sic] seen [sic] you on 9-7-04. You were brought up to medical floor on 9-3-04 for observation. Our physian [sic] put you on medication. Hopefully this problem has been resolved."[4] (Dkt. 1, Attach. 3; Dkt. 69, p. 6).

In Plaintiff's September 8, 2004 grievance, he stated in pertinent part "Doctor says Ibuprophen and antibiotics will take care of problem. I have seen him 2 times since this happened along with x-rays. I would like a 2nd opinion on my injuries." (Dkt. 1, Attach. 3; Dkt. 69, p. 8). In his December 2, 2004 grievance, Plaintiff states that "the doctor and outside doctor say there is

---

[4]In the "Time Line" Plaintiff submitted to the Court, he admits that on September 2, 2004, he was seen by the triage nurse; on September 3, 4, and 6, 2004, he was in the medical department for "observation"; and on September 7, 2004, Dr. McKay examined him (Dkt. 1, Attach. 2).

nothing wrong..." (Dkt. 1, Attach. 3; Dkt. 69, p. 10). In Plaintiff's "Time Line" he states that he was seen by Dr. McKay on September 21, 2004, and given medication and ear drops; he was seen by the nurse on October 13, 2004; and in January, 2005, he was "finally seen by a [sic] outside doctor...'but to him; nothing wrong that he can see." (Dkt. 1, Attach. 2).

It is evident from Plaintiff's own documentation[5] that his grievances were not ignored, and he received medical care for the injuries he sustained when Burliegh attacked him. Plaintiff was seen on several occasions by nurses and Doctor McKay. X-rays were taken to diagnose his injuries. He received pain medication, antibiotics, and other medication for his injuries. He was even seen by an outside doctor who concluded that "nothing was wrong" with Plaintiff.

"[A] simple difference in medical opinion between the prison's medical staff and the inmate as to the latter's diagnosis or course of treatment [does not] support a claim of cruel and unusual punishment." *Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991), *citing Waldrop*, 871 F.2d at 1033. The documentation Plaintiff included with his complaint shows that the Defendants provided Plaintiff with medical care and treatment for his injuries, but not the care and treatment Plaintiff believes he should have received. Therefore, Plaintiff fails to state a claim for deliberate indifference to his serious medical needs.

Moreover, even if Dr. McKay's care and treatment did not successfully alleviate Plaintiff's ailments, at best, the documentation only permits the conclusion that Dr. McKay was negligent,

___

[5]It is well-settled that when considering a motion to dismiss, a court may consider not only the pleadings, but also the exhibits attached thereto. *See Grossman v. Nationsbank, N.A.*, 225 F.3d 1228, 1231 (11th Cir. 2000). A court may consider documents attached to the complaint or directly referred to in the complaint, and doing so will not convert the motion to one for summary judgment. *See Brooks v. Blue Cross & Blue Shield*, 116 F. 3d 1364,1369 (11th Cir.1997)(citing *Venture Assoc. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir.1993)) (citations omitted); *Solis-Ramirez on behalf of Solis v. United States Dep't of Justice*, 758 F.2d 1426, 1430 (11th Cir.1985); *see also Fecht v. The Price Co.*, 70 F.3d 1078, 1080 n. 1 (9th Cir.1995)("Documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered in ruling on a Rule 12(b)(6) motion to dismiss.") (internal quotation omitted). Furthermore, where there is a conflict between allegations in a pleading and exhibits thereto, the exhibits control. *See Tucker v. National Linen Service Corp.*, 200 F.2d 858, 864 (5th Cir. 1953); *Simmons v. Peavy-Welsh Lumber Co.*, 113 F.2d 812, 813 (5th Cir. 1940), *cert. denied*, 311 U.S. 685 (1940); *see also Bell v. Lane*, 657 F.Supp. 815, 817 (N.D. 111.1987) ("Where exhibits attached to a complaint negate its allegations, a court is not required to credit the unsupported allegations").

which is insufficient for a claim of deliberate indifference. *See Farrow*, 320 F.3d at 1243.

Likewise, to the extent Plaintiff claims Dr. McKay was deliberately indifferent to his serious medical needs when he stopped Plaintiff's heart medications, the documentation refutes Plaintiff's claim. In his "Time Line" Plaintiff states that on February 9, 2005, Dr. McKay stopped giving Plaintiff his medication "to see if this will stop the pressure in [his] right ear and dizziness." (Dkt. 1, Attach. 2). On February 10, 2005, Dr. McKay informed Plaintiff that he was stopping the medication because "[h]e is still thinking the problems [Plaintiff has] are due to [his] heart attack." (Id.). The "Time Line" also shows that while Plaintiff was taken off his medication, his blood pressure was consistently monitored, and he had an E.K.G. (Id.). Accordingly, Plaintiff's own documentation only permits the conclusion that Dr. McKay, at best, was negligent.

Nothing in the Second Amended Complaint and the documentation Plaintiff filed with the Court supports an inference that Dr. McKay or any member of the PCJ medical staff acted with indifference to Plaintiff's medical needs – deliberate or otherwise.[6] There is nothing before the Court that supports Plaintiff's claim that Defendant McKay's conduct constitutes a violation of constitutional magnitude. *See Wilson v. Seiter, supra* at 297; *Daniels v. Williams*, 474 U.S. 327, 329-30 (1986).

**Medical Negligence Claims against Dr. McKay**

To the extent Plaintiff claims Dr. McKay was negligent in his care and treatment of Plaintiff, Defendant McKay moves to dismiss the claim for Plaintiff's failure to comply with the presuit notice

---

[6]*See Wilson v. Seiter*, 501 U.S. 294, 297-99 (1991) ("allegations of inadvertent failure to provide adequate medical care, or of a negligent . . . diagnos[is] simply fail to establish the requisite culpable state of mind. . . It is *obduracy and wantonness, not inadvertence or error in good faith,* that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause" (emphasis in original; citations omitted; internal quotation marks omitted)).

and investigation requirements of Sections 766.106[7] and 766.203[8], Florida Statutes (*See* Dkt. 64 at pp. 4-7). Chapter 766 sets out a presuit investigation procedure that both a claimant and a defendant must satisfy before a medical negligence claim can be brought in court. *Kukral v. Mekras*, 679 So. 2d 278 (Fla. 1996). If a court finds that a claimant has not complied with presuit procedures prior to filing his complaint, § 766.206(2), Florida Statutes instructs the court to dismiss the action. The presuit investigation requirements are not jurisdictional but rather are conditions precedent to the bringing of a medical malpractice action. *Kukral*, 679 So. 2d at 283. Nevertheless, where a plaintiff fails to comply with a certain aspect of presuit procedure and the default cannot be remedied before the statute of limitations runs, the court's dismissal should be with prejudice. *See, e.g., Correa v. Robertson*, 693 So. 2d 619 (Fla. 2d DCA 1997); *Royle v. Florida Hospital-East Orlando*, 679 So. 2d 1209 (Fla. 5th DCA 1996).

Plaintiff has not alleged nor demonstrated that he initiated and completed Chapter 766's presuit screening process.[9] Since the Plaintiff has failed to comply with the presuit requirements,

---

[7]766.106(2)(a) states in pertinent part "[a]fter completion of presuit investigation pursuant to s. 766.203(2) and prior to filing a complaint for medical negligence, a claimant shall notify each prospective defendant by certified mail, return receipt requested, of intent to initiate litigation for medical negligence."

[8]766.203(2) states "[p]rior to issuing notification of intent to initiate medical negligence litigation pursuant to s. 766.106, the claimant shall conduct an investigation to ascertain that there are reasonable grounds to believe that:

(a) Any named defendant in the litigation was negligent in the care or treatment of the claimant; and

(b) Such negligence resulted in injury to the claimant.

Corroboration of reasonable grounds to initiate medical negligence litigation shall be provided by the claimant's submission of a verified written medical expert opinion from a medical expert as defined in s. 766.202(6), at the time the notice of intent to initiate litigation is mailed, which statement shall corroborate reasonable grounds to support the claim of medical negligence."

[9]With his Memorandum of Law to the Second Amended Civil Rights Complaint, Plaintiff attached a "Notice of Intent to Initiate Litigation Civil Court State of Florida" that purported to put Dr. McKay on notice that Plaintiff intended to bring a medical malpractice action against him (Dkt. 70, Ex. D). Even if Plaintiff's notice of intent to initiate litigation was adequate, and Plaintiff complied with the requirements of 766.106, he does not allege or demonstrate that he complied with the presuit investigation requirements of 766.203.

11

his medical negligence claims must be dismissed.

**Retaliation Claim against Dr. McKay**

Plaintiff alleges that Dr. McKay retaliated against him for filing grievances regarding his medical care by ordering Plaintiff to be moved from general population to an isolation cell in the mental health wing at PCJ where Plaintiff remained for six days from January 25, 2005 through January 31, 2005. .

"It is an established principle of constitutional law that an inmate is considered to be exercising his First Amendment right of freedom of speech when he complains to the prison's administrators about the conditions of his confinement...It is also established that an inmate may maintain a cause of action against prison administrators who retaliate against him for making such complaints...To prevail, the inmate must establish these elements: (1) his speech was constitutionally protected; (2) the inmate suffered adverse action such that the administrator's allegedly retaliatory conduct would likely deter a person of ordinary firmness from engaging in such speech; and (3) there is a causal relationship between the retaliatory action and the protected speech." *Smith v. Mosley*, 2008 U.S. App. LEXIS 14202, *14 (11th Cir. 2008)(citations omitted).

"A prisoner can establish retaliation by demonstrating that the prison official's actions were the result of his having filed a grievance concerning the conditions of his imprisonment." *Farrow v. West*, 320 F.3d 1235, 1248 (11th Cir. 2003)(internal quotation and citation omitted). However, conclusory allegations of retaliation are insufficient to state a claim under § 1983. *Goldsmith v. Mayor and City Council of Baltimore*, 987 F.2d 1064, 1071 (4th Cir. 1993); *Gill v. Mooney*, 824 F.2d 192, 194 (2d Cir. 1987). The prisoner must sufficiently allege facts establishing that the actions taken against him were in retaliation for filing lawsuits and accessing

the courts. *Wright v. Newsome*, 795 F.2d 964, 968 (11th Cir. 1986). Plaintiff must allege a causal link between the protected activity and the adverse treatment, and there must be at least a "colorable suspicion" of retaliation for a complaint to survive and proceed into discovery. *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983). Such a causal connection may be alleged by a chronology of events that create a plausible inference of retaliation. *Cain v. Lane*, 857 F.2d 1139, 1143 n.6 (7th Cir. 1988).

A prisoner must show more than his personal belief that he is the victim of retaliation. *Woods v. Edwards*, 51 F.3d 577, 580 (5th Cir. 1995). The prisoner must produce "specific, nonconclusory factual allegations that establish improper motive causing cognizable injury." *Crawford-El v. Britton*, 523 U.S. 574, 598 (1998). Because claims of retaliation may be easily fabricated, they should be reviewed with skepticism. *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995).

Plaintiff alleges he was placed in the isolation cell on January 25, 2005, for six days because he filed grievances requesting medical treatment and complaining that he was not receiving adequate treatment. However, in Plaintiff's "Time Line" he states that he was told he was being placed in the cell for medical observation because of his ongoing complaints of dizziness, loss of memory, blackouts, light-headed sensations, ringing in the ears, inability to sleep, etc. Plaintiff admits in his "Time Line" that a nurse came to his cell every day to examine him and take his blood pressure, and that on January 28, 2005, Dr. McKay visited him and told him that Plaintiff was going to be re-evaluated then returned to general population on January 31, 2005 (Dkt. 1, Attach. 2).

Plaintiff's allegation that Dr. McKay placed him in the isolation cell for six days in

retaliation for filing grievances regarding his medical care is merely conclusory. Accordingly, Plaintiff has failed to state a cognizable claim of retaliation.

**Claims against Unnamed Deputies**

Pursuant to the Eighth Amendment, prison officials must "protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 833 (1994). Constitutional liability, however, does not result from every injury suffered by a prisoner at the hands of another. *Id.* at 833. In order to be held liable for failing to prevent an attack from other inmates, a prison official "must be both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. Allegations of negligent conduct do not state a constitutional claim and thus, are not actionable under § 1983. *Farrow*, 320 F.3d at 1245. "Merely negligent failure to protect an inmate from attack does not justify liability under section 1983 . . . . The known risk of injury must be a strong likelihood, rather than a mere possibility before a guard's failure to act can constitute deliberate indifference." *Brown v. Hughes*, 894 F.2d 1533, 1537 (11th Cir. 1990) (citations and internal quotations omitted).

Plaintiff fails to state an Eighth Amendment claim that the deputies failed to protect him, which resulted in the attack on him by Burliegh. He alleges in his Second Amended Complaint that the deputies at PCJ failed to adequately restrain Burliegh, and failed to notify the deputies who transferred Burliegh to the courthouse of Burliegh's "Red Dot status." He then alleges the deputies who transferred Burliegh failed to adequately check Burliegh's restraints. Plaintiff admits that Burliegh was restrained with handcuffs, belly chains, and a black box, but claims Burliegh had a history of violence and a reputation for escaping from handcuffs, belly chains, and

14

black box security devices. He does not, however, allege that the deputies who transferred Burliegh and placed Burliegh in the same holding cell with Plaintiff were aware of Burliegh's history of violence and reputation for escaping restraints.

Plaintiff does assert that approximately five minutes before Burliegh escaped from his restraints, Plaintiff told the deputies that he wanted to be moved from the holding cell because Burliegh had a history of violence and a reputation for escaping from restraints.[10] However, "[g]eneral knowledge about an inmate's violent tendencies, without more specific information about the risk, does not constitute deliberate indifference" especially where there is no evidence that the attacker posed a specific risk to the victim. *See Lavender v. Kearney*, 206 Fed. Appx. 860, 863-64 (11th Cir. 2006) (unpublished opinion)(citing *Carter v. Galloway*, 352 F.3d 1346, 1349-50 (11th Cir. 2003). Plaintiff does not allege that he and Burliegh knew each other, or that Burliegh threatened him before the attack. Plaintiff does not allege sufficient facts showing that the deputies were aware of specific facts from which an inference could be drawn that a substantial risk of serious harm existed, and that the deputies drew that inference. The deputies arguably should have placed Plaintiff elsewhere but, again, "merely negligent failure to protect an inmate from attack does not justify liability under section 1983..." *See Brown v. Hughes*, 894 F.2d at 1537.

Plaintiff also alleges that he was subjected to cruel and unusual punishment by some unnamed deputies when they shut off his water supply for the first thirty-six (36) hours he was in

---

[10]In Plaintiff's grievance dated September 8, 2004, he states, in pertinent part, "[Burliegh] told me to call the CO's and have them move me for he was going to get loose of his 'Black Box' and start hitting me. I said your kidding - the next thing I know is he had one hand loose - when I called for help. By the time the CO's came in to subdue him, he had hit my neck, head and right side of my head several times." (Dkt. 1, Attach. 3; Dkt. 69, p. 8). This version of the events does not support the contention that the deputies had any subjective awareness of a substantial risk of serious harm to Plaintiff prior to Burliegh's attack.

the isolation cell between January 25, 2005 and January 31, 2005; when they constantly banged on his cell door and left the lights on in his cell twenty-four (24) hours per day during that period which caused him physical and emotional distress and loss of sleep; and when the communication device in his cell was inoperable which prevented him from communicating with staff outside the cell.

State officials violate the Eighth Amendment if they fail to provide prisoners with reasonably adequate food, clothing, shelter, and sanitation. *Hamm v. DeKalb County*, 774 F.2d 1567, 1572 (11th Cir. 1985), *cert. denied* 475 U.S. 1096 (1986). Although Petitioner alleges the water was turned off in his cell for thirty-six (36) hours, he does not allege that he was denied food or liquids.[11]  In his "Time Line" he states that on January 27, 2005, the water in his cell was turned on and he could now "use toilet [and] brush [his] teeth." (Dkt. 1, Attach. 2).  Despite his claim that he was cut off from communicating with others outside his cell, in his "Time Line" he admits that a nurse would come to his cell each day to monitor his blood pressure, that he did speak to both medical staff and deputies, and that he did speak with Dr. McKay (Id.).  Also in his "Time Line" Plaintiff complains that he was getting only two to three hours sleep each night. However, he attributes his lack of sleep not only to the lights remaining on in his cell, but also to numbness in his arms, pain, anxiety, nurses checking his blood pressure, and the noise made by other inmates who were constantly screaming and banging on their doors (Id.).  Plaintiff's complaints amount to nothing more than minor discomforts rather than constitutional violations.

Finally, Plaintiff alleges that on February 11, 2005, between 9:00 p.m. and 10:30 p.m., he advised an unnamed deputy that he was having a heart attack, but the deputy ignored him.  At

---

[11]In his "Time Line" Plaintiff admits he was provided with meals while in the isolation cell.

11:00 p.m., Plaintiff was transported to Bayonet Point Hospital for emergency treatment for a heart attack.

In his August 3, 2005 grievance, Plaintiff states that on February 11, 2005, between 9:30 and 10:30 p.m., he began having chest pains and numbness in his arms (Dkt. 1, Attach. 3). Believing that he should see the nurse, Plaintiff attempted to attract the guard's attention. When Deputy Vazquez would not "talk or listen" to Plaintiff "about using the phone," Plaintiff placed a Medical Request Form in the cell door stating: "I need to talk to the nurse A.S.A.P. I'm scared. Need questions answered. Please for peace of mind and heart. Getting pains behind eyes, left hands [sic] goes numb. Please just a few questions. I have no one to call or anyone to visit me. Please have a [sic] compassion. I can't call my sister til tomorrow night." (Dkt. 1, Attach. 3; Dkt. 70, Ex. B, Medical Request Form dated Feb. 11, 2005).

After a shift change, an unidentified deputy became aware of Plaintiff's complaints and notified medical personnel. At 11:00 p.m., Plaintiff was transported to a hospital, where his condition was stabilized.

An official acts with deliberate indifference when he intentionally delays providing an inmate with access to medical treatment, knowing that the inmate has a life-threatening condition or an urgent medical condition that would be exacerbated by delay. *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999) (citing *Lancaster v. Monroe County, Alabama*, 116 F.3d 1419, 1425 (11th Cir. 1997). It is apparent from Plaintiff's August 3, 2005 grievance and medical request form that he did not make Deputy Vazquez aware that he had an urgent medical condition that would be exacerbated by delay. Plaintiff complains that Deputy Vazquez "would not talk or listen to me about using the phone," and although in his medical request form Plaintiff

17

asked to see the nurse as soon as possible, and stated he was having pain behind his eyes and his left hand was going numb, Plaintiff did not state that he believed he was having a heart attack, and in no way expressed or intimated that he was in need of immediate medical care.  Nor does he allege that he exhibited any physical signs of distress that would have made it apparent to Deputy Vazquez that Plaintiff needed immediate medical attention  Plaintiff fails to allege sufficient facts showing that Deputy Vazquez was subjectively aware that there was a risk of serious harm to Plaintiff.

ACCORDINGLY, the Court **ORDERS** that:

1.  Defendant McKay's Second Amended Motion to Dismiss (Dkt. 64) is **GRANTED**.

2.  Plaintiff's Second Amended Complaint is **DISMISSED** for failure to state a claim upon which relief

3. The Clerk of the Court is directed to enter judgment against Plaintiff, terminate any and all pending motions, and close this case.

**DONE and ORDERED** in Tampa, Florida, on _July 18_, 2008.

_____

JAMES D. WHITTEMORE
United States District Judge

SA: sfc
Copy to: *Pro Se* Plaintiff
          Counsel of Record

18